POTTHOFF et al. v. HANSON & VAN WINKLE CO.

(Circuit Court, D. New Jersey. June 6, 1907.)

PATENTS—INFRINGEMENT—BATH AND PROCESS FOR COATING METALS.

    The Alexander reissue patent, No. 11,624 (original No. 563,723), for an electrolytic bath for coating metals and a process of galvanically coating metals subjected to rapid oxidation, can only be sustained as involving invention by giving the claims a literal construction, and, as so construed, it is not infringed by the use of a bath which contains no basic salts of the plating metal, such as are specified in the patent as constituting the essence of the invention, but which, on the contrary, is maintained in an acid state, and is composed in part of different ingredients, is prepared differently and under different conditions, and its ingredients, where the same, are in different proportions.

In Equity. On final hearing.

Clifton V. Edwards and Julian S. Wooster, for complainants.
Knight Bros. and Henry C. Workman, for defendant.

CROSS, District Judge. The bill is founded upon reissue patent No. 11,624, issued August 3, 1897, to one Hans Alexander, assignor to Louis Potthoff. The original patent was No. 563,723. The defendants strenuously deny the title of the complainants to the reissued patent, and also its validity, both because of alleged irregularity in its issue and for want of invention in view of the prior art. As I re-

gard the case, however, it will be unnecessary to consider any of the defenses just suggested further than to say that, after a careful read-ing of the testimony relating to the prior art, it is demonstrated, in my judgment, that, if the patent in suit can be upheld, it can only be by giving the claims involved a literal rendering, since they cannot be interpreted broadly without destroying all pretense to novelty or invention. The patent is in no sense basic. With the claims then inter-preted narrowly, as they must be, the defendant has not infringed. This is said in face of the fact that the patent is claimed to be generic, or, at least, the first in the art which has proved successful. It should be said in this connection, however, that, while it appears that the complainant corporation has indeed built up a considerable business of the character indicated by the patent, it does not appear, certainly not conclusively, that the patented process and bath are practicable. The president of the complainant corporation, the assignor of the in-ventor, admits that for several years the results obtained under the patent were bad, and that he was discouraged and thought of dropping the matter entirely, but that later they became satisfactory. As against his testimony, however, is that of six witnesses, all of whom were licensees or workmen for licensees under the patent, who testified that the process was not practicable but worthless, and that they were compelled to abandon it. Moreover, no present licensee of the complainants is produced to show that the process as practiced by him is the same or substantially the same as that described in the patent; hence it is at least doubtful under the evidence whether the patented bath and process are really valuable notwithstanding the tes-timony of the president of the complainant corporation that he has always followed them.

Speaking of his invention, the patentee says:

"My invention relates to coating or plating of metals as are subjected to rapid and permeating oxidation (iron and steel) galvanically with other metals, resisting the atmospheric influence, for the purpose of protecting such metals against disintegrating oxidation; and it consists of a process wherein basic salts of aluminium, or a basic salt of the metal to be used for the coating or plating, are used in the bath and the same metal is made the anode."

The claims involved are the first and third, which read as follows:

"1. An electrolytic bath for coating metals, composed of a solution of from five to eight parts of commercial chlorid of aluminium containing free acid in one hundred parts of water and of so much of reguline coating metal, as will dissolve therein, while the bath is heated to the boiling-point, and from two-tenths to three-tenths of a part of chlorid of the coating metal."

"3. The process of galvanically coating metals, subjected to rapid oxidation, with metallic alloys, containing a small percentage aluminium, consisting in subjecting the metals to the action of an electric current in an electrolytic bath, composed of a solution of five to eight parts of commercial chlorid of aluminium, dissolved in one hundred parts of water and of so much of regu-line metal as will dissolve therein, with some organic acid added to the bath, and using an anode, made of the metal, forming the principal component of the coating alloy."

It is wholly unnecessary to cite authorities to show either that in-fringement must be clearly shown or that the burden of proving it rests upon the complainants. At the outset it may be said that the

complainants have not laid any legal foundation upon which to rest a qualitative or quantitative comparison between the bath of the patent in suit and that which would be formed by using defendant's salts pursuant to its directions. It is true that the complainants' expert analyzes certain salts alleged to have been procured from the defendants, but the proof fails to show that they were, as a matter of fact, manufactured or sold by the defendant. It appears that the defendant at one time sold to the Otis Elevator Company certain galvanizing and toning salts which it is alleged were handed to the complainants' expert and formed the basis of his analysis. The testimony upon this point, however, is incomplete and inconclusive. It was given by the president of the complainant company, and is all contained in the following questions and answers:

"Q. Did you hand Dr. Horne [complainants' expert] the samples of galvanizing salts and toning salt concerning which he has testified in this case?
"A. Yes; I did.
"Q. Where did you procure these samples?
"A. I took them from the original packages delivered to us from the Otis Elevator Company, furnished by the Hansen & Van Winkle Company to them. These packages were marked with the Hansen & Van Winkle firm name."

The testimony was "objected to as hearsay, and not the best evidence, or any evidence that the matters referred to were made and sold or delivered to the Otis Elevator Company by defendants. So far as the answer refers to the packages, it is objected to because the packages themselves are not produced or their absence accounted for." The evidence in question was clearly incompetent under objection. It was hearsay, and failed to establish that the packages from which the samples were taken for analysis were indeed original packages, or that they were furnished by the defendant to the Otis Elevator Company. The testimony was based purely upon assumption and hearsay. It does not appear who, on behalf of the elevator company, delivered the packages, or to whom they were delivered, or how or when they were delivered, or that the witness had any knowledge of the size, shape, character, or appearance of the original packages containing the defendant's product; nor is there any evidence to show that they had not been opened, and the contents adulterated, changed, or tampered with. Evidence of an analysis based upon proof such as that just detailed must be rejected. The testimony was taken under specific objection, and, being illegal, cannot be considered. It must be regarded as stricken out, and with it goes all of the testimony of the expert that relates to an analysis of the salts in question. Again, it appears that the analysis was not made by the expert in person, but through an assistant who was not produced as a witness. Nevertheless the expert says that he was present to give proper instructions and to satisfy himself of the results of the analysis. It is evident, however, from his admissions, that he was working to produce results which had been foreshadowed by his client, and, although he admits that the results were different in composition from what he had been led to expect, he still maintains that he had no reason to doubt the accuracy of his analysis. His evidence, if admissible at all, would certainly have been far more satisfactory and conclusive had he been able

to tell definitely from personal knowledge what was done and how it was done. It this connection, it should be added that this same expert admits that he never prepared or analyzed a galvanized bath or solution made in accordance with the defendant's instructions. For the above reasons, a very considerable part of complainants' testimony designed to show infringement is either wholly unavailable or decidedly lacking in probative force. For evidence of infringement then the complainants must rely upon an admission entered upon the record as follows:

"Defendant admits that before, but not more than six years before, the bringing of the present suit and since the granting of the letters patent in suit, it has manufactured and sold salts for use in electro-galvanic baths composed and made as follows:

"The defendant mechanically intermingles in a dry state alum and sulphate of zinc in the proportion of four (4) parts by weight of zinc to one (1) part of alum.

"With this mixture is furnished for convenient shipment a paste consisting of this mixture and sulphuric acid.

"The mixture first described and the acid mixture are sold separately to customers with directions to use them by adding the acid mixture to the other in the electro-galvanic bath in such proportion that the resulting bath contains in solution one (1) ounce of the acid mixture to two (2) pounds of the mixture of sulphate, zinc and alum.

"No materials other than the above, and water, are used in the bath, and no heat is used in preparing either mixture or in preparing the solution thereof forming the electro-galvanic bath.

"That defendant has sold no other electro-galvanic baths or salts or solutions or processes and is not preparing so to do."

And upon a letter of instructions sent by the defendant to the Otis Elevator Company, for making its solutions, as follows:

"This solution is made by dissolving two lbs. of 'H. & V. W.' galvanizing salts to each gallon of water, adding one oz. of toning salts to each gallon, first dissolving the toning salts in a portion of the solution. Zinc anodes should then be hung in the solution and allowed to remain for twelve hours, then skim and solution will be ready for use. At this point the density of the solution should be about 15 deg. Baume. Better results are obtained if solution is maintained at a temperature of 70 deg. Fahrenheit.

"The 'H. & V. W.' cast zinc anodes should be used, not only on account of purity, but for the reason that the wear is more uniform and disintegration of the metal, with subsequent loss, is much less in this form than in the rolled plate.

"Anodes should be cleaned occasionally to remove oxide.

"Should the solution, after some use, plate slowly showing too blue a color, add one-half to one-third oz. of toning salts to each gallon, first dissolving the toning salts in a portion of the solution.

"If the solution is much worked and is not brought into good action by the addition of toning salts, and should it have increased in density to 20 deg. to 22 deg. Baume, dilute to 14 deg. and bring up to 16 deg. by addition of galvanizing salts."

Then follow certain directions for removing grease, rust, or scale from the article about to be plated. These admissions, with the testimony of the complainants' expert in relation thereto, are all the evidence that remains to show infringement. The first claim in suit is for an electrolytic bath for coating metals, composed as therein described, while the third is for a process of galvanically coating metals subjected to rapid oxidation. The complainants claim that in the use

of the patent in suit a coating of zinc alloyed with aluminium is obtained. Claim 3 specifically mentions this, and it is implied in claim 1, if that claim is to be considered as setting forth the invention. The defendant denies that such an alloy as claimed can be made. Prof. Chandler, the eminent chemist and scientific expert, testified that it could not, and cites numerous well-known standard scientific authorities in support of his view. But, however that may be, the solution of the defendant does not produce any such alloy, as an analysis of its product discovers no aluminium or aluminium in alloy with zinc. This is said notwithstanding the fact that Dr. Horne, on behalf of the complainants, testified that he found a very small percentage in the defendant's product. The weight of the testimony is to the contrary. It appears, therefore, that the results produced by the two methods are different. Again, a careful reading of the specification of the patent in suit shows that the invention depends upon the use of basic salts. At the very beginning of his specification the inventor says:

"My invention consists of a process wherein basic salts of aluminium or a basic salt of the metal to be used for the coating or plating are used in the bath."

This statement, in substance, appears in five or six more places in the specification. If, therefore, any one thing is made clearer thereby than another, it is that the invention is characterized by the use of basic salts held in solution as elsewhere stated by an organic acid. Prof. Chandler has defined a basic salt as one in which there is an excess of the basic constituent of the salt or what is the same thing, a deficiency of the acid constituent. Basic salt is therefore one in which the basic constituent is in excess of that required to satisfy the acid constituent; whereas in ordinary or normal or neutral salts the acid and basic constituents are balanced; or, as Dr. Horne, the complainants' expert, puts it, a basic salt is a salt containing a preponderance of a base. That the inventor was aware of the difference between ordinary and basic salts is apparent from reading the specification. The specification of the patent, with the testimony, makes it clear that the bath of the patent is necessarily basic, and was so intended. The defendant's bath, on the contrary, is acid and contains free sulphuric acid. It is the opposite of the basic bath, and not only is it acid in the first instance, but it is maintained so by the introduction from time to time of additional acid to keep it in a proper working condition. The difference between the two baths in this respect is concisely and forcibly expressed in the brief of the defendant as follows:

"It is the patentee's main object and consistent effort to produce a bath which is basic—containing basic salts. He boils metal in a solution of salt until no more metal will dissolve. If, by reason of expense he is driven to using an acid-containing salt, his first care is to neutralize that acid or bind it. Acid is, so to speak, a bête noire to the inventor. But defendant deliberately and designedly chooses acid, precisely what the inventor most carefully avoids; and not only so, but defendant maintains the acid condition of his bath by addition of acid directly from time to time. In fact, defendant's bath won't work unless acid. But the patent bath will not work unless it is basic, and the patentee maintains its basicity with an organic or equivalent substance. It will not be an equivalent substance that does not maintain the bath's basic character."

The sulphuric acid added by the defendant to keep its bath in working condition is not an equivalent of the organic acid or hydrate of carbon mentioned in the patent. Prof. Chandler, speaking upon this point, says that the defendant uses no organic acid in its bath, or, to quote his exact language:

"No organic acid and no hydrate of carbon is added to it. In fact, the bath of the stipulation is employed in a condition which is the very opposite of the basic condition described and claimed in the patent in suit."

Again, not only are the components of the bath different for the most part, but wherein they are similar they differ in proportion. A patent of the character under consideration must necessarily be definite to be valuable, and a patentee cannot complain if one, by the use of different constituents or the same, but differing widely in amount, substantially differentiates his process from the patented one. Dr. Chandler has shown upon the basis of Dr. Horne's figures that the defendant's solution contains more zinc, more acid, and more aluminium phosphate than would a bath made to correspond with the patent, and, in one place, he goes as far as to say that it is apparent at the first glance that the only substance in defendant's bath that is specified in either one of the claims of the patent in suit is water. Then, too, the conditions of mixing or preparing the baths are essentially different, so that not only are the ingredients of the bath different in kind and amount, but their preparation is different. The patent prescribes conditions that will, as we have seen, inevitably result in basic salts. The complainants' expert seems to ignore this, or, to say the least, does not satisfactorily explain it. He furthermore insists that, where the claims of the patent call for chlorid of aluminium, the sulphate may be substituted, or, in other words, that the claims of the patent include either. He finds his authority for this in the specification, where it is said, "Instead of chlorid of the metals, sulphates may be used as well." At first sight, his contention seems plausible, but upon examining the preceding clause we see that the word "metals," as used in the above quotation, refers to the coating metals. The two sentences which are in juxtaposition, read together, are as follows:

"In all of these baths the coating metal [zinc, tin, tin and zinc, copper, or nickel] is made the anode. Instead of chlorids of the metals sulphates may be used as well."

Then, too, in the specification, just before the above extract, when speaking of the different coating metals which may be used, the inventor says:

"For coating with copper, sulphate of copper; for coating with tin, sulphate of tin; and for coating with nickel, sulphate of nickel."

It seems clear, therefore, that when he says, "instead of chlorids of the metals sulphates may be used," he referred, and referred only, to the coating metals, the metals selected for the anodes. Aluminium is not a coating metal under this patent. He nowhere speaks of it as such. On the contrary, it is frequently and invariably distinguished therefrom. It is introduced in the bath apparently to improve the quality or appearance of the coating metal, and in the form of chlorid is the foundation of the baths described in the patent. The defendant

does not use chlorid of aluminium so that in this respect also we find the defendant's bath and process clearly and substantially differentiated from the complainants. This opinion cannot be so well concluded or the distinguishing differences between the baths and processes of the complainants and defendant, so well and clearly expressed as by using the language of Prof. Chandler, when he said:

"The defendant's bath is not the bath of the patent in suit, nor is it any one of the baths of the patent in suit, nor is it the bath of any one of the claims of the patent in suit. * * * Defendant's bath is not prepared in the same way as the bath of the patent in suit. The most striking feature of the patent in suit is the employment of a bath containing basic salts, and extraordinary means are resorted to in the specification to render the bath basic; that is, to secure a bath in which the salts shall be the basic salts of aluminium and zinc. As the patentee states, these salts are with difficulty soluble, and, in order to keep them in solution, and prevent their being precipitated, he makes use of an addition of citric or tartaric acid, or of sugar, and thus converts these basic salts into double salts, which are easily soluble in water, as he states on page 2 of his specification, in several places, between lines 29 and 54. It must not be assumed in reading this portion of the specification that this result therein described of keeping the basic salts in solution can be accomplished by converting them into any kind of double salts. They must be converted into double salts which are easily soluble in water, and double salts containing citric or tartaric acid, or sugar. * * * No such conditions as described in the specification exist in defendant's baths. The baths are not basic baths. No such extraordinary methods are employed to render them basic as are described and claimed in the patent in suit. In fact, the very opposite treatment is resorted to. Sulphuric acid is added at the outset, and from time to time during the use of the bath. Hence no basic salts of aluminium are contained in defendant's bath originally, or permitted to be formed there, and no such means as described in the patent—that is, the use of citric, or tartaric acid or sugar—are necessary to produce such double salts as are referred to in the specification. * * *

"It is thus evident that the reason why basic salts of aluminium are not precipitated in defendant's bath is because he does not have any basic salts. He carefully avoids making them in the original preparation of his bath, and he prevents their forming in the bath during its use by the use of his toning salt. * * * Defendant does not use basic salts of any kind in the preparation of his bath, does not produce basic salts in the preparation of his bath, adds free acid from time to time to prevent the formation of basic salts, does not use aluminium chloride in any form, does not boil aluminium chloride with zinc, does not boil aluminium chloride with aluminium, does not electrolyze an excess of aluminium or zinc into aluminium chloride, to make the bath basic or to produce basic salts. As he does not produce any basic salts with the aid of chloride of aluminium, he does not require and does not use any tartaric acid or citric acid or sugar (sugar is the substance understood by the term hydrate of carbon in the specification) in order to hold basic salts in solution. He does not add chloride of zinc to chloride of aluminium in the preparation of his bath or in the use of it."

For the following, among other reasons, then, the defendant does not infringe, it does not make the alloyed coating of the patent, employs no basic salts, but rather makes and maintains throughout an acid bath, does not use chlorid of aluminium in its salts, does not use any organic substance with its salts or bath, or any equivalent thereof. and its bath is composed in part of different ingredients from the complainants', is prepared differently and under different conditions, and its ingredients, in so far as they are the same, appear in different proportions.

The bill of complaint will accordingly be dismissed, with costs.